UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| DONNA R. BENTLEY, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | CAUSE NO. 3:14CV1589 |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, COMM'R OF SOC. SEC., | ) ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

An administrative law judge denied Donna Bentley's application for Social Security disability insurance benefits. Bentley claims that the ALJ erred by not affording controlling weight to her treating physician, failing to account for the impact of her headaches on her ability to work, and finding her less than fully credible. I will remand on the first two issues.

**BACKGROUND**

Readers looking for a more extensive discussion of Bentley's medical record are directed to the detailed summaries in the ALJ's decision (R. 10-30) and in Bentley's opening brief (DE 12). Rather than simply reiterating those summaries, I will give a brief overview of the history of Bentley's disability claim.

Although Bentley suffers from a handful of severe impairments, the ones relevant to this discussion are her back and neck problems and her headaches.

1

Bentley's troubles started when she was in a car accident in June of 2010. Over the course of the next nine months, Bentley saw her family physician, a chiropractor, a pain management specialist, a physical therapist, and a orthopedic surgeon to treat her ongoing back and neck pain. (*See generally* DE 12 at 2-5.) Throughout this time, her treatments included various pain medications, physical therapy, chiropractic adjustments, and epidural injections. (*Id*.) When these treatments failed to resolve her issues, she was referred to a neurosurgeon. (DE 12 at 5.)

Bentley first met with the neurosurgeon, Dr. Jamie Gottlieb, M.D., in March 2011, complaining of severe headaches, severe neck pain that radiated into her hands and low back pain, none of which had been adequately helped with more conservative treatments. (R. 754-55.) Dr. Gottlieb's examination revealed various positive tests consistent with these reports, such as a positive "spurling's maneuver,"[1] which indicated that her pain was radiating into her hands, and a positive straight leg raising in both legs.[2] (*Id*.) Her lumbar spine and sciatic notch were also tender to the touch. (*Id*.) Dr. Gottlieb also reviewed some of Bentley's previous MRIs from August 2010 and found a bulging disc and a mild-to-moderate narrowing of the nerve pathway in her cervical and lumbar spine. (*Id*.) Because she had failed more conservative treatment, he recommended surgery on her neck, but also recommended holding off on surgery on

---

[1] Spurling's maneuver is a test used to determine where pain radiates. Spurling's Test, https://en.wikipedia.org/wiki/Spurling%27s_test (last visited Sept. 22, 2015).

[2] The straight leg test is used to detect disc herniation in the lumbar spine. Straight Leg Raise, https://en.wikipedia.org/wiki/Straight_leg_raise (last visited Sept. 22, 2015).

her lumbar spine in case the neck surgery helped resolve that issue, as well. (*Id*.) Bentley said she would think about whether to proceed with the surgery. (*Id*.)

The next month, Bentley's symptoms had gotten worse. (R. 753.) Dr. Gottlieb was concerned that the worsened symptoms indicated "greater pathology," so he ordered a new MRI on Bentley's neck and found various physical problems in Bentley's cervical spine. (*Id*.) He continued to recommend surgery. (*Id*.)

The new MRI showed a bone spur at disc level C4-5 with mild effacement of the thecal sac and mild narrowing of the left C4-5 foramen. (R. 511.) Dr. Gottlieb also noted bulging at the C5-6 disc with mild effacement of the thecal sac and mild neural foraminal stenosis. (*Id*.) At that same level, he also noted a small central disc protrusion, but found it was not compressing the spinal cord or nerve roots. (*Id*.) Essentially, what all this boils down to is that Bentley had some bulges and protrusions where they shouldn't be in her spinal column, and those bulges and protrusions made the inside of her spinal column narrower than it should be. *See* Diffuse Cervical Bulge, http://www.americanspinal.com/ diffuse -cervical-bulge.html (last visited September 21, 2015); Bone Spurs, http://www.mayoclinic.org/diseases-conditions/bone-spurs/ basics/ definition/con-20024478 (last visited September 21, 2015). In some patients, those conditions cause pain, whereas some patients have no symptoms. *Id*. Bentley also exhibited kyphosis in the C4-C7 range, which means her neck was hunched over in this area. Kyphosis, http://www.mayoclinic.org/diseases-conditions/kyphosis/ basics/ definition/con-20026732 (last visited Sept. 22, 2015). Dr. Gottlieb further found

that "[s]he has failed to respond to all conservative measures including medications, injections, and therapy." (R. 752.) He again recommended surgery. (*Id*.)

Based on the above findings and Bentley's lack of response to all conservative treatments, Dr. Gottlieb performed a surgery on Bentley's neck whereby he fused her vertebrae together at levels C4 through C7. (R. 559-560, 752.) The surgery went well. (*Id*.) Her neck improved, although she still had some pain. (R.748-50.) Dr. Gottlieb had Bentley use a bone stimulator to improve the pain at the site of her fusion. (R. 747.)

But Bentley's low back was still giving her trouble. In August 2011, she reported increased lower back pain. (R. 748.) The next month, Bentley underwent a medial branch block due to a failed lumbar epidural steroid injection. (R. 528, DE 12 at 7.) After this procedure failed to give Bentley relief from her pain, her pain specialist performed a radiofrequency ablation on her medial branch nerves in the lumbar area in November 2011. (R. 512-13.) This procedure, also known as radiofrequency rhizotomy, involves heating up the nerves and/or burning the nerves so that they no longer cause pain. *See* Radiofreqency Ablation for Arthritis Pain, http://www.webmd.com/pain-management/radiofrequency-ablation (last visited September 21, 2015); Radiofrequency Ablation, https://en.wikipedia.org/ wiki/Radiofrequency_ablation (last visited September 21, 2015); Radiofrequency Rhisotomy, http://www.mycdi.com/knowledge_center/pain_management/radiofrequency_rf_rhizotomy_for_pain_relief/ (last visited September 21, 2015).

4

This procedure provided Bentley some improvement. Although she still reported lumbar and neck pain, her pain had stopped radiating. (R. 793.) In November 2011, at a follow up visit with Dr. Gottlieb, he found that "[o]verall, the back seems better,"although "[s]he still has pain" in her lumbar spine and "some neck pain and headaches." (*Id*.) He said that she could "try to return to work and see how she tolerates it." (*Id*.)

The following month Dr. Gottlieb authored a medical opinion letter stating that Bentley was six months post-surgery and was still having low back pain, neck pain, and headaches. (R. 743.) He restricted her to lifting no more than 10 lbs and no bending or twisting, and found that she needs to change positions frequently. (*Id*.) He also noted that she would need to lie down intermittently for periods of 30-45 minutes, due to pain. (*Id*.) He concluded that she was "incapable of even sedentary type work." (*Id*.) Either Bentley or someone at the physician's office filled out a pain diagram around that time indicating she had an aching sensation in her head, neck, and low back, and also indicating her low back and neck pain were at a level about midway between no pain and the worst possible pain. (R. 791-92) That portion of the questionnaire did not ask her to rate her head pain. On the questionnaire, Bentley noted her pain was the same as her last visit. (R. 792.)

This same month, Bentley was examined by a nurse practitioner and physical therapist. (R. 735-39.) Bentley exhibited a very limited range of motion in her neck in all directions, inability to bend more than 30 degrees forward, weakness in her upper

5

extremities, an unsatisfactory back extension, marginal back flexion and hip motions. (R.736, 739.) The test could not be completed due to Bentley's pain. (R. 739.) The nurse practitioner found that Bentley was "not medically acceptable for stated position." (R. 735.)

At her next follow-up appointment with Dr. Gottlieb in February 2012, Dr. Gottlieb found that although things had "improved somewhat since the start of treatment," Bentley still had "significant headaches and neck pain as well as low back pain and some numbness and tingling in her hands." (R. 789.) He also stated that "she will not ever be able to go back to the factory-type work she as doing before" and that he would check back with her later in the year. (*Id*.) Here again, Bentley (or the staff) filled out a pain chart indicating the same level of pain in the same areas as the visit two months previously. (R. 787-88.)

Around this same time, Dr. Dorwyn Collier, D.O. examined Bentley at the request of the Disability Determination Bureau. (R. 834-841.) Bentley reported neck and lower back pain and migraines. (R. 840.) The findings were mostly normal other than some reduction in movement of the cervical spine and shoulders, and a decreased range of motion in her neck. (R. 840-41.) Significantly, Dr. Collier also found that Bentley could not drive due to her decreased range of motion in her neck. (*Id*.)

Also that month (February 2012), Dr. Brill, a non-examining physician evaluated Bentley's records at the request of the Disability Determination Bureau. (R. 860-868.) At first, Dr. Brill found that Bentley had no severe impairments (R. 860), but Dr. Brill

6

then (confusingly) submitted a second opinion finding that she did have a back disorder (R. 861, R. 23), but could perform essentially light work (R. 862-868, 871). State agency physician William Shipley, Ph.D. affirmed the first opinion (presumably affirming only the mental health RFC) and state agency physician Dr. Corcoran, M.D. affirmed the second (corrected) opinion. (R. 869-70.)

In June 2012, Bentley began seeing a pain specialist named Dr. Ajit Pai, M.D. In July, she reported that her pain was a 7/10, which corresponded to a rating of "severe (disabling, unable to perform [Activities of Daily Living])." (R. 889.) At her next follow up appointment with Dr. Gottlieb in July 2012, Bentley's neck and arm were doing better, but she was still having "a lot of pain in the low back with aching and burning." (R. 876.) Dr. Gottlieb noted that she had rhizotomies at L3 through S1, but that the relief she experienced was short-lived. (*Id*.) He recommended a medial branch block with Dr. Pai (her pain specialist) and continued maintenance with her pain medications. (*Id*.)

Bentley had the branch block, but she had a bad reaction to it. (R. 875.) She also reported to Dr. Pai that it gave her only a couple of days of relief. (R. 882.) Bentley reported moderate pain that was frequent; aggravated by walking, standing, or movement; and alleviated by rest, lying down, and pain medication. (*Id*.) Dr. Pai observed at this time that she had an antalgic gait – meaning she was walking in a certain way as to avoid pain. (R. 883; Antalgic Gait, https://en.wikipedia.org/wiki/Antalgic_gait (last visited Sept. 22, 2015).) She had some moderate tenderness in her lumbar area, but her straight leg test was negative. (*Id*.) At this point, she reported her

7

pain as 6/10, which corresponded to a rating of "moderate (significant interference with ADL)." (R. 883.)

At her follow-up with Dr. Gottlieb that same month, Bentley reported that her neck was doing better, although she still had headaches and some numbness. (R. 875.) Her lower back, however, was still a problem. (*Id*.) Dr. Gottlieb recommended a course of 4-8 injections and possible rhizotomies, and physical therapy for 8-10 weeks. If she did not improve, then he would suggest dorsal column stimulation or an open surgical decompression and fusion for her lumbar spine. (*Id*.) He said he would see her again at the end of the year. (*Id*.)

In October 2012, Bentley saw Dr. Pai again and reported that her pain was at a level of 8/10, or "severe (disabling, unable to perform ADL [activities of daily living])." (R. 880.) She was having difficulty walking. (R. 879.) Her gait was still antalgic, her straight leg raising test was negative, and she had mild tenderness in the lumbar spine on both sides. (R. 880.) That is where her treatment records appear to end.

Bentley protectively applied for disability insurance benefits in December 2011, alleging a disability onset date of May 31, 2011. The ALJ conducted a hearing on March 27, 2013. (R. 13.) In the opinion denying benefits, the ALJ found that Bentley had a multitude of severe impairments but that she nonetheless retained a residual functional capacity that allowed her to do a number of jobs in the national economy. (*See generally* R. 13-25.)

## DISCUSSION

If an ALJ's findings are supported by "substantial evidence," then they must be sustained. *See* 42 U.S.C. § 405(g). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Review of the ALJ's findings is deferential. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). "Although this standard is generous, it is not entirely uncritical and the case must be remanded if the decision lacks evidentiary support." *Id.* (internal quotation marks omitted). In making a substantial evidence determination, I must review the record as a whole, but I can't re-weigh the evidence or substitute my judgment for that of the ALJ. *Id.*

Bentley objects to the ALJ's decision on three grounds: 1) the ALJ failed to give controlling weight to Dr. Jamie Gottleib, M.D., Bentley's treating physician who also performed her neck surgery; 2) the ALJ failed to take into account the impact Bentley's headaches have on her ability to work; and 3) the ALJ erred in finding Bentley less than fully credible. Although I have concerns about the ALJ's handling in each of these areas, my biggest concern is the fact that the ALJ's decision to discount Bentley's treating physician's opinion was not supported by substantial evidence. That's enough to remand. But I'll also consider the "headaches" issue because the ALJ made significant errors there, as well.

9

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *see White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). Once well-supported contradicting evidence is introduced, however, the treating physician's opinion is no longer entitled to controlling weight and becomes "just one more piece of evidence for the [ALJ] to weigh." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). This rule takes into account the treating physician's advantage in "having personally examined the claimant and developed a rapport, while controlling for the biases that a treating physician may develop such as friendship with the patient." *Oakes v. Astrue*, 258 Fed.Appx 38, 43-44 (7th Cir. 2001) (internal citation omitted); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). If an ALJ decides not to give controlling weight to a treating physician's opinion, however, he must explain his reasons for doing so. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). Failure to do so is cause for remand. *Id.* And that's where the ALJ's opinion here gets into trouble.

There is no dispute that Dr. Gottlieb is Bentley's treating physician. (DE 17 at 7.) And to be clear, the ALJ didn't ignore Dr. Gottlieb's opinion. Quite to the contrary, the ALJ discussed Dr. Gottlieb's opinion at length. But what the ALJ didn't do was adequately explain why he was accepting or discounting various parts of Dr. Gottlieb's opinion.

10

Throughout his decision, the ALJ runs through each physician's findings and indicates which parts he credits or doesn't credit. Interestingly, there's not a single opinion he accepts entirely, which in and of itself isn't a problem. But what *is* a problem is the lack of explanation for the parts he either accepts or discounts, particularly regarding Dr. Gottlieb. For example, the ALJ's primary reason for not fully crediting Dr. Gottlieb's opinion is the fact that Bentley exhibited some improvement in November 2011, but then Dr. Gottlieb found she couldn't work in December 2011 and February 2012. I don't see the inconsistency here. Just because Bentley improved a bit during November doesn't mean that any backsliding of her condition should be discredited as "inconsistent." This strikes me a classic case of "cherry-picking" that the Seventh Circuit has denounced time and time again. *Scott*, 647 F.3d at 740; *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). And it also fails to recognize the tendencies of certain conditions – particularly those involving pain and neuropathy – to wax and wane. *See* Migraine Symptoms and other Headache Symptoms, http://www.webmd.com/migraines-headaches/guide/migraines-headaches-symptoms (last visited Sept. 23, 2015); *see also e.g. Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). That's not to say that every ALJ must accept or reject every opinion whole-cloth. But what they need to do is base their decisions as to what to accept or reject on substantial evidence. And that simply didn't happen here.

An ALJ's failure to explain why he is discounting a treating physician's opinion is cause for remand. *Scott*, 647 F.3d at 740. That's, in part, because an ALJ must build a

11

logical bridge from the evidence to the conclusion. *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998). In other words, even though the evidence relied on by the ALJ to reach his conclusions may constitute contradicting evidence such that he could discount Gottlieb's opinion, the ALJ must explain why that's the case. Specifically, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott*, 647 F. 3d at 740. The only explanation the ALJ gave for not fully crediting Dr. Gottlieb's assessment was that his opinion that Bentley could not go back to work in a factory setting in February 2012 conflicted with improvement indicated in November 2011, and the fact that disability determinations are reserved for the commissioner. (R. 20-21.) I certainly agree with the ALJ on the second point, but that doesn't preclude him from giving controlling weight to Dr. Gottlieb's *medical* opinions. Instead, evaluating the factors outlined in *Scott* and other cases, it's apparent that Dr. Gottlieb's opinion as a treating physician should have been given controlling weight: he saw Bentley about every couple of months for over a year, including performing major surgery on her and prescribing various other serious procedures for her; his specialty is in neurology which is certainly the right field for someone dealing with nerve pain; and he routinely ordered and performed a barrage of testing on Bentley over the course of his treatment including MRIs, CT scans, diagnostic injections, and occupational evaluations.

The ALJ's real quibble seems to be with the "consistency and supportability of the physician's opinion" (*Scott*, 647 F.3d at 740) and I have a hard time seeing Dr. Gottlieb's opinions as anything but consistent or supported. Post-surgery, Bentley's neck did a little better, but she still reported problems in her lumbar area. Dr. Gottlieb at that point appeared to take a sort of a wait-and-see approach. The pain in her lumbar area then got worse, sending her to more frequent visits with Dr. Gottlieb and leaving to more injections, rhizomities, branch blocks, etc. From November 2011 through 2012, Bentley reported headaches, some pain in her neck, and significant pain in her lumbar area. Sure, her back "seemed better" at one appointment (November 2011), but compared to what? I don't read this as Dr. Gottlieb saying she was cured, and certainly given the extent of the procedures and further consultations with other doctors that Bentley had throughout 2012, that wasn't the case.

What's more, the ALJ failed to mention at all the opinion of the nurse practitioner at the Community Occupational Medicine, LLC who confirmed Dr. Gottlieb's findings. An ALJ cannot simply ignore a line of evidence because it doesn't support his conclusion. *Herron*, 19 F.3d at 333. And "[w]hen the ALJ fails to mention an entire line of evidence in his decision, we are unable to conduct a meaningful review because we cannot establish if substantial evidence supported the denial of benefits." *Id*. at 337. In a case like this where that evidence supports an opinion that would otherwise receive controlling weight, it can hardly be harmless error to omit it entirely.

The ALJ really only points to one appointment indicating some improvement, and the evaluations of the state agency physicians who never met with Bentley – one of whom had to correct his opinion due to error. And even then, the ALJ didn't fully credit their opinions. (R. 21, 23.) So it's very unclear to me what evidence the ALJ was relying on in deciding that Dr. Gottlieb's opinion shouldn't be given controlling weight. Supposed inconsistencies aside, Dr. Gottlieb's statements and notes remain the only significant source of medical evidence in this case. And one thing an ALJ cannot do is substitute his own judgment for that of a medical professional, or make medical conclusions about a claimant's illness, without relying on medical evidence. *See Clifford*, 227 F.3d at 870; *Green v. Apfel*, 204 F.3d 780, 781-82 (7th Cir. 2000). When the ALJ attempted to refute Dr. Gottlieb's statements, the dearth of medical evidence led him to rely on his lay judgments about medical records and cherry-pick bits and pieces without much reason to do so. And that's simply not allowed.

At bottom, Bentley has been in a lot of pain for a long time. When more conservative treatments didn't work, she ended up with a series of injections, and then major surgery. When even that didn't help (or didn't help enough), she went through various rounds of other procedures including more injections, nerve blocks, rhizotomies, and even a spinal stimulator implant. All of these things support Dr. Gottlieb's opinion that Bentley was in bad shape. I therefore find that the ALJ's decision to not give Dr. Gottlieb's opinion controlling weight was not supported by substantial evidence.

Although this issue is enough to remand, I also feel I should note that the ALJ erred in completely discounting Bentley's headaches. In determining how her headaches may limit her capacity to work, the ALJ should have considered factors such as Bentley's daily activities, the timing and duration of her headaches, and the measures she takes to treat her headaches. 20 C.F.R. § 404.1529(c), *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012.) The ALJ purported to do this, but in the process, ended up misstating much of the record.

The ALJ found that although Bentley had reported her headaches to her doctors "on occasion," she only treated them with OTC medications and lying down. (R. 15.) He then found that "[t]here is no indication of the severity or frequency of the migraines documents in th record" and "the claimant has not reported migraines to her pain management physician." (R. 15-16.) The ALJ's recitation of the facts doesn't take into account the full record.

First, Bentley reported her headaches at almost every appointment since her accident and also reported that they occur daily. For example, she reported "severe headaches" to Dr. Gottlieb in March 2011 (R. 754), worsening headaches over the next couple of visits (R. 752-53), and was still having some headaches in November 2011 (R. 793), and she reported her headaches on pain charts for Dr. Gottlieb in December 2011 (R. 791-92) and February 2012 (R. 787-88). Dr. Gottlieb noted these headaches in his medical opinion from December 2011, and further indicated that Bentley needed to lie down for 30-45 minutes due to "pain" (although, he doesn't specify whether the pain is

15

due to her head, back, neck, or all three). (R. 743.) Dr. Gottlieb also found that these headaches were "significant." (R. 789.) The state agency physician, Dr. Collier, also noted in February 2012 that Bentley reported daily migraines with no relief. (R. 836.) A state agency physician noted the same. (R. 871.)

It is true, however, that Bentley didn't report her headaches to Dr. Pai, her pain specialist. I don't really know why she didn't, but neither does the ALJ. Maybe it's because she was referred to Dr. Pai for the pain in her lumbar area and specifically to receive a nerve block in that area (R. 889, 891-92). But it doesn't appear that the ALJ ever asked her why she didn't report her headaches to Dr. Pai and it's his duty to fully develop the record. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir.1994). Otherwise, he can't really build a logical bridge between the evidence and his conclusion that the fact that she didn't report them to Dr. Pai must mean her headaches weren't severe. *Shauger*, 675 F.3d at 697-98. To say that there is no indication of the severity and duration of her headaches and that she only reported them "on occasion" is misleading. The record indicates ongoing significant headaches that, at times, plagued Bentley on a daily basis, and she reported them to multiple physicians on a regular basis.

It's also not the case — as was suggested by the ALJ — that Bentley treats her headaches with only OTC medications. Bentley was on several strong narcotics for her back and neck that are also used to treat migraine headaches – a point Bentley directly made to the ALJ during her testimony at the hearing. (R. 42-43.)

16

In sum, the record indicates that Bentley reported her headaches on a regular basis to her physicians, that the pain was at times present on a daily basis, and that even taking strong narcotics and lying down did not adequately relieve her pain. The ALJ's conclusion that her headaches would "not more than minimally interfere with the claimant's ability to perform basic work activity" (R. 16) was therefore not supported by substantial evidence.

## CONCLUSION

For the reasons stated above, this cause is **REMANDED** for further proceedings consistent with this order.

**SO ORDERED.**


ENTERED: September 28, 2015		s/Philip P. Simon
					PHILIP P. SIMON, CHIEF JUDGE
					UNITED STATES DISTRICT COURT